IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| v. | : | Criminal Action No. 07-028-JJF |
| LICURTIS G. WHITNEY and JONATHAN EWELL | : | |
| Defendant. | : | |

### MEMORDANDUM IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE

Defendant, Jonathan Ewell, by and through his undersigned counsel, Eleni Kousoulis, Assistant Federal Public Defender for the District of Delaware, respectfully submits this Memorandum of Law in support of his Motion to Suppress Physical Evidence. For the reasons set forth below, Mr. Ewell seeks to exclude the Government's admission, at trial, of any and all physical evidence illegally seized by law enforcement officials on or about December 10, 2006, and any statements made during, or subsequent to, his illegal seizure and arrest.

**I. INTRODUCTION**

On February 27, 2007, the Grand Jury for the District of Delaware returned an Indictment with Notice of Forfeiture, charging Licurtis G. Whitney and Mr. Ewell with: knowingly conspiring to possess with the intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), all in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2 (Count I); and knowingly possessing with the intent to distribute 50 grams or more of a mixture and substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and 18 U.S.C. § 2 (Count II). On June 25, 2007, Mr. Ewell filed a Motion to Suppress Physical

Evidence, and Mr. Whitney filed a similar motion on September 7, 2007. On December 5, 2007, this Court conducted an evidentiary hearing to determine the motions.

Mr. Ewell submits that law enforcement officials lacked reasonable suspicion or probable cause to conduct the traffic stop that led to his arrest and seizure of evidence. Thus, all evidence should be suppressed in accordance with the "fruit of the poisonous tree" doctrine expressed in Wong Sun v. United States, 371 U.S. 471 (1963).

**II. FACTUAL BACKGROUND**

**A. Evidentiary Hearing Testimony**

During the hearing, the Government presented the testimony of: (1) Corporal Stephen Brock; Officer Malcolm Stoddard; (3) Officer William DuPont; and (4) Special Agent David Gorrell. The relevant testimony is summarized as follows.

**1. Corporal Stephen Brock'sTestimony**

Corporal Brock testified that on December 10, 2006, he received information from an informant[1] that a white Acura with Maryland license plates and tinted windows was picking up a large quantity of narcotics. (Tr. 5-6, 10, 17). Corporal Brock responded to the scene in an undercover police vehicle and observed the vehicle, which he confirmed to be a match of the description. (Tr. 6).

Corporal Brock testified that he observed a black male standing on the sidewalk and having a conversation with the occupants of the vehicle. (Tr. 7-8, 11). Corporal Brock testified that he did

---

[1] Corporal Brock testified that he knew the informant, but had never used this individual in the past, and that the individual had contacted the officers in person. (Tr. 10, 23-26). After receiving this information, Officer Brock immediately responded to the scene. (Tr. 26).

not know how many occupants were in the vehicle, or whether any of the defendants could have been the man standing on the sidewalk outside of the car. (Tr. 11, 27).

Corporal Brock testified that he did not observe any transactions between the car and the individual on the sidewalk, and that he only witnessed a conversation. (Tr. 13-15). After driving around the block, Corporal Brock realized the vehicle was gone, but noticed it a block away. (Tr. 7, 12-13). Corporal Brock followed the vehicle from a block away, or approximately 300 feet, and saw it make "a righthand turn onto 24th Street without using its turn signal." (Tr. 7, 15). Corporal Brock testified that this was a violation of the Delaware Traffic Code and requested assistance to conduct a traffic stop. (Tr. 8). Officers Malcolm Stoddard and William DuPont responded and initiated a traffic stop of the Acura. (Tr. 8-9). Corporal Brock stated that he intially stayed in his vehicle during the traffic stop, but subsequently assisted Officers Stoddard and DuPont. (Tr. 19-20). Corporal Brock also testified that he did not observe any drugs. (Tr. 21-22).

### 2. **Officer Malcolm Stoddard's Testimony**

Officer Stoddard testified that he and Officer DuPont received the information from an informant[2] about the white Acura and relayed it to Corporal Brock. (Tr. 34). Officers Stoddard and DuPont subsequently received a call from Corporal Brock after he had located the vehicle, stating that it had not used its turn signal. (Tr. 33-34).

After stopping the vehicle, Officer Stoddard approached the passenger side, and the officers lit up the vehicle with a candlepower for "officer safety." (Tr. 35, 47). Officer Stoddard testified that as the officers approached the vehicle, he noticed the driver, whom he identified as Mr. Whitney,

---

[2] Officer Stoddard testified that he had not personally used the informant in the past and was not familiar with him. (Tr. 40, 55). Officer Stoddard also testified that the informant was an individual that had been pulled over during a traffic stop. (Tr. 55-56).

moving around and reaching behind his seat. (Tr. 35, 44). Officer Stoddard stated that he thought there might be a gun in the vehicle. (Tr. 35).

Officer Stoddard testified that Mr. Whitney put down the driver's and passenger windows, and that Officer DuPont informed him about the nature of the traffic stop. (Tr. 36). Officer Stoddard opined that Mr. Whitney, the driver, and Mr. Ewell, the passenger, were "nervous" and "jittery," and Officer DuPont "had to tell [Mr. Whitney] several times to place his hands up on the steering wheel . . . ." (Tr. 36). Officer Stoddard testified that Mr. Whitney appeared to be looking for his license. (Tr. 36).

According to Officer Stoddard, Officer DuPont saw "white crumbs" on Mr. Whitney's jacket after he tried to find his identification, and the officers "flash[ed] around the interior of the vehicle, at which point Officer DuPont observed, like, a clear knotted sandwich baggy essentially with an off-white chunky-type substance which . . . - - appeared to be consistent of crack cocaine." (Tr. 37, 47-48). Officer Stoddard testified that he also saw the baggy behind the driver's seat, and Officer DuPont took Mr. Whitney into custody. (Tr. 36-37).

Officer Stoddard testified that "[a]s all this was going on and I was keeping an eye also on the passenger for our safety concerns, . . . I observed pretty much an identical clear plastic sandwich type bag knotted baggy . . . appear[ing] to contain the same type off-white chunky-type substance consistent with cocaine, crack cocaine . . . sitting in on Mr. Ewell's . . . lap, almost . . . his right hip area was partially covered, concealed with his . . . black jacket that night." (Tr. 38, 48-49). Officer Stoddard asked Mr. Ewell to exit the vehicle, to which he complied, and "that package that I was describing to you before actually fell and landed on my right foot." (Tr. 38, 49-50). Officer Stoddard took Mr. Ewell into custody. (Tr. 38). Mr. Whitney was later cited for failure to signal. (Tr. 39).

### 3. **Officer William DuPont's Testimony**

Officer DuPont testified that after he and Officer Stoddard conducted a traffic stop of the vehicle, he illuminated the inside of the vehicle and observed Mr. Whitney "moving around the front compartment of the vehicle back and forth, side to side." (Tr. 66-68, 82).  Officer DuPont approached the driver's side and asked for Mr. Whitney's license and registration.  (Tr. 68, 76, 82).  According to Officer DuPont, Mr. Whitney rifled through his glove box, seemed "very confused and very nervous," and he asked him to place his hands on the steering wheel.  (Tr. 68-69, 76-78, 84, 94).

Officer DuPont testified that he observed several small crumbs on the folds of Mr. Whitney's sweater, which appeared to be consistent with crack cocaine.  (Tr. 69, 79, 84).  Officer DuPont shined his flashlight on the rear floorboard area directly behind Mr. Whitney's seat and observed a large, clear plastic bag knotted at the top which also contained an off-white chunky substance consistent with crack cocaine.  (Tr. 69-70, 79-80).  Officer DuPont testified that the bag contained approximately 125 grams of cocaine base.  (Tr. 71).

Officer DuPont further testified that he never noticed a clear plastic bag on Mr. Ewell's lap, and never saw anything fall from his lap.  (Tr. 81, 82).  Officer DuPont stated that he was not aware of the second bag of drugs until after Officer Stoddard informed him of it.  (Tr. 81).

Officer DuPont also testified regarding the information from the informant.  Officer DuPont testified that the officers conducted a traffic stop of a vehicle after observing an altercation and traffic violation, but did not issue a citation to the driver. (Tr. 84-89).  Officer DuPont stated that the driver, who had pending drug charges, asked for his help in getting some of the charges dismissed and gave the officers the information regarding the white Acura. (Tr. 89).  Officer DuPont stated that he spoke to an officer handling the informant's case, but did not know the disposition of his case.  (Tr. 89).

### III. ARGUMENT

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." See U.S. CONST. Amend. IV. The United States Supreme Court noted that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Terry v. Ohio, 392 U.S. 1, 9 (1968) (citing Union Pacific R.R. Co. v. Botsford, 141 U.S. 250, 251 (1891)). "As a general rule, the Supreme Court has interpreted the Fourth Amendment's reasonableness requirement to mean that seizures and searches must be based on probable cause and executed pursuant to a search warrant." United States v. Johnson, 238 F.Supp.2d 663 (D.Del. 2002).

If an officer does not have a warrant, he or she "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has reasonable suspicion that criminal activity is afoot." Id., citing United States v. Robertson, 305 F.3d 164 (3d Cir. 2002) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)); see also United States v. Sharpe, 470 U.S. 675 (1985) (stating that an investigatory Terry stop may ripen into an arrest if the duration of the stop or the amount of force used is "unreasonable"); Wiers v. Barnes, 925 F.Supp. 1079, 1087 (D.Del. 1996) (stating that the Fourth Amendment requires application of the "reasonableness standard" to actions by law enforcement officers, and the test is an objective one: "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.") (citations omitted); United States v. McGrath, 89 F.Supp.2d 569 (E.D. Pa. 2000) (stating that the continued detention of a suspect must be based upon probable cause).

Pursuant to Terry, reasonable suspicion of criminal activity is defined as "specific and

6

articulable facts which, taken together with reasonable inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21 (stating that this "demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence."). In evaluating reasonable suspicion, courts must consider the totality of the circumstances. United States v. Valentine, 232 F.3d 350 (3d Cir. 2000).

The Third Circuit and Supreme Court have consistently recognized that the government cannot rely on a tip unless it demonstrates the basis of the informant's knowledge and the informant's reliability or veracity, and that courts must consider the tip's content and other surrounding circumstances. See e.g. Whiteley v. Warden, Wyoming State Penitentiary, 401 U.S. 560, 567 (1971) (stating that if the "initial impetus" for an arrest is an informer's tip, information gathered by the arresting officers can be used to sustain a finding of probable cause for an arrest that could not be supported by the tip alone, if the information acquired by the arresting officers corroborates the informer's tip that the arrestee committed the felony or was in the process of committing the felony); see also Illinois v. Gates, 462 U.S. 213 (1983) (stating that corroborating the details of an informant's tip is an important step in establishing the veracity of an informant); United States v. Ubiles, 224 F.3d 213 (3d Cir. 2000) (rejecting an anonymous informant's gun tip as basis for reasonable suspicion where the tip did not indicate that the individual was going to use the gun unlawfully or had threatened to commit a crime, as well as safety arguments regarding the defendant's gun); see also United States v. Hill, No. CRIM.A.04-41-JJF, 2005 WL 1745662 (D.Del. July 19, 2005) (stating that corroboration is "particularly important when an informant has no past history of reliability.") .

In Alabama v. White, 496 U.S. 325, 326 (1990), the Supreme Court identified the problems inherent in police reliance on anonymous tips:

[A]n anonymous tip seldom demonstrates the informant's basis of knowledge or

7

> veracity inasmuch as ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations and given that the veracity of persons supplying anonymous tips is 'by hypothesis largely unknown, and unknowable. This is not to say that an anonymous caller could never provide the reasonable suspicion necessary for a Terry stop . . . [T]he tip [here] provides virtually nothing from which one might conclude that [the caller] is either honest or his information reliable; likewise, the [tip] gives absolutely no indication of the basis for the [caller's] predictions regarding . . . criminal activities. By requiring 'something more' . . . we merely apply what we said in [Adams v. Williams, 407 U.S. 143 (1972]: 'Some tips, completely lacking in indicia or reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized.

Id. at 329.  See also Florida v. J.L., 529 U.S. 266 (2000) (holding that officers lacked reasonable suspicion to make a Terry stop based on a "bare" anonymous tip that a black male standing at a bus stop carried a gun); United States v. Goodrich, 450 F.3d 552, 560 (3d Cir. 2006) (concluding that an informant's vague tip was reliable because of the police officer's prior relationship with the informant, the informant's real-time narration of suspicious behavior and the suspicious activity matching a pattern of criminal activity of which the police were aware).

In United States v. Roberson, 90 F.3d 75 (1996), the Third Circuit addressed the necessity for corroboration of an anonymous informer's tip.  In Roberson, an anonymous caller identified the defendant's physical description and stated that he was selling drugs at a specified location.  The anonymous tip was relayed to the police, who saw a man meeting the defendant's description standing on a corner known to be a "hot area" for drug trafficking.  The officers observed the defendant walk to a car that was facing the wrong way down a street, and lean in as if speaking with the vehicle's occupants.  The officers, who observed no indicia of drug activity, approached the defendant and observed the butt of a gun protruding from his pants.  The officers patted the defendant down and seized a gun and drugs.

The Third Circuit found that the anonymous informer's tip had no predictive value that could corroborate future events, and that the police had no basis for assessing the informant's reliability or the grounds in which the informant believed that a crime was being committed. The Court made clear that where the officers failed to corroborate readily observable facts and did not observe suspicious behavior, no reasonable suspicion existed to support an investigative stop. The Court also noted that the "police were not powerless to act on the non-predictive, anonymous tip," and could have "set up a surveillance of the defendant . . . to observe suspicious behavior." Id. at 81.

Here, the officers, in the course of conducting an earlier traffic stop, received information from an informant that a white Acura contained a large quantity of drugs. The officers testified at the evidentiary hearing that they had never worked with this informant, and the Government introduced no evidence to otherwise establish this individual's reliability. Moreover, Corporal Brock, the officer that responded to the scene of the informant's tip, did not observe any suspicious behavior prior to Officer Stoddard's and Officer DuPont's traffic stop. Thus, at the outset, the officers acted on the basis of an unreliable and uncorroborated tip and lacked reasonable suspicion or probable cause to conduct a Terry stop on the basis of suspected criminal activity.

With regard to the officer's reasonable suspicion to conduct a traffic stop, although the officers' subjective intent is generally not relevant to the court's determination, the Third Circuit explained in United States v. Delfin-Colfina, 464 F.3d 392 (3d Cir. 2006):

> [A]n officer's Fourth Amendment burden of production is (1) to identify the ordinance or statute that he believed had been violated, and (2) provide specific articulable facts that would support an objective determination of whether any officer could have possessed reasonable suspicion of the alleged infraction. As long as both prongs are met, an officer's subjective understanding of the law at issue would not be relevant to the court's determination.

Id. at 399-400. Thus, although the officers' state of mind may not be relevant, it is clear that the

9

officers in this case were acting with the purpose of stopping the vehicle on suspicion of drug activity, based on the unreliable informant's tip.

Mr. Ewell further submits that Officer Stoddard's testimony is inconsistent with Officer DuPont's and Corporal Brock's testimony, and the officers' credibility should be questioned with regard to the basis for the traffic stop and the bag of drugs that were allegedly found in the car and in Mr. Ewell's lap. First, Corporal Brock is the only officer who witnessed the alleged traffic violation and it is clear from the record that he wanted to stop the vehicle on the basis of the tip.

Second, the officers testified that they illuminated the vehicle with flashlights upon arrival, but did not see drugs at the time. For Example, Officer Stoddard, who was standing on the passenger side of the vehicle, alleges that he saw drugs in Mr. Ewell's lap, but neither he nor his partner saw any drugs in Mr. Ewell's lap when they first approached the car or while Mr. Whitney was looking for his license in the glove compartment. Mr. Ewell submits that the officer's search of the vehicle exceeded the scope of the traffic stop, and that the evidence in this matter must be suppressed. See Wong-Sun v. United States, 471 U.S. 407 (1963).

## IV. CONCLUSION

For the foregoing reasons, the physical evidence must be suppressed because it is the fruit of the officers' unlawful activities.

Respectfully submitted,

/s/ Eleni Kousoulis
Eleni Kousoulis, Esquire
Assistant Federal Public Defender

Attorney for Defendant, Jonathan Ewell

Federal Public Defender
One Customs House
704 King Street, Suite 110
Wilmington, DE 19801
(302) 573-6010
ecf_de@msn.com

Dated: February 19, 2008